CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAR 2 2 2012

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

DENNIS CROFT,                         )
                                      )
        Plaintiff,                    )      Civil Action No. 7:11CV00277
                                      )
v.                                    )      **MEMORANDUM OPINION**
                                      )
CITY OF ROANOKE,                      )      By: Hon. Glen E. Conrad
                                      )      Chief United States District Judge
        Defendant.                    )

In this employment discrimination action under Title VII of the Civil Rights Act of 1964

("Title VII"), Dennis Croft, a firefighter employed by the City of Roanoke, claims that the City

subjected him to disparate discipline on the basis of gender.[1] The case is presently before the

court on the City's motion for summary judgment. For the reasons that follow, the motion will

be granted.

## Background

The following facts are presented in the light most favorable to the plaintiff. See

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (noting that all evidence must be

construed in the light most favorable to the party opposing summary judgment).

Croft has worked for the Roanoke City Fire-EMS Department ("Fire Department") for 22

years. He eventually attained the rank of Captain. In that position, Croft was considered the

"commanding officer" of his assigned station, Fire Station No. 4. (Mot. for Summ. J., Ex. 6.)

---

[1] The plaintiff's complaint also asserted a claim of retaliation under Title VII. However, at the
plaintiff's request, the retaliation claim will be dismissed pursuant to Rule 41(a)(2) of the Federal Rules
of Civil Procedure, leaving only the claim of gender discrimination.

Croft was responsible for managing the operation of the station, training and supervising the other employees assigned to the station, and enforcing Fire Department policies and rules.  Id.

In December of 2009, Croft began dating another employee of the Fire Department, Deborah Van Ness.  Van Ness worked for the Fire Department as a part-time, temporary Emergency Medical Technician ("EMT").

On the night of April 15, 2010, after completing her shift, Van Ness visited Croft at Fire Station No. 4, while he was on duty.  Although the Fire Department had an unwritten policy prohibiting visitors after 10:00 p.m., Van Ness stayed with Croft until approximately 1:00 a.m.

At 12:50 a.m., while Van Ness was still at the station, Tim Harris and Robert Joyner were dispatched to an emergency ambulance call.  As they were leaving the station to respond to the call, Harris and Joyner observed Van Ness's vehicle in the parking lot.  When they returned from the emergency call, Van Ness's vehicle was no longer there.  Harris had observed Van Ness talking to Croft at approximately 10:30 p.m., and both firefighters had seen Van Ness and Croft together at the station on previous occasions.

Harris and Joyner spoke to the Station Lieutenant, Dean Russell, regarding the fact that Croft had entertained Van Ness at such a late hour.  Thereafter, on April 17, 2010, Croft called his direct supervisor, Battalion Chief Jeff Beckner, and advised Beckner that he had violated the Fire Department's visitation policy.  Croft indicated that he and Van Ness had fallen asleep in the station's television room and that they had been awakened by the emergency dispatch tone at approximately 12:50 a.m.  "Having no reason to suspect that any other policies were violated, Beckner did not recommend that a formal investigation be conducted." (Mot. for Summ. J., Ex. 8.)  Instead, Beckner issued Croft a verbal reprimand.

2

On June 5, 2010, Croft ended his romantic relationship with Van Ness. Several days later, Roanoke City Fire Chief David Hoback learned that a dispute had arisen involving Croft, Van Ness, and another female employee, Kathryn Edwards. On June 10, 2010, Hoback was present when Battalion Chief Beckner received a phone call from Leo Edwards, Kathryn's husband. Beckner understood the husband's comments to mean that he was aware that his wife and Croft were having an affair. Beckner relayed the contents of the conversation to Hoback. At Hoback's request, Beckner drafted a written memorandum summarizing the conversation:

> On June 10 at approximately 15:30 I received a call from Leo Edwards saying he would appreciate it if there was anything I could do to help Katherine [sic] to keep her job. He said currently that was the only money coming in and they were currently in bankruptcy. He stated that he did not know what was going on with Katherine [sic] and Dennis, but he could not afford to leave her at this time.

(Mot. for Summ. J., Supp. Ex. A.)

Hoback met with Croft on June 10, 2010 and instructed him to resolve his personal problems outside of the workplace. Croft subsequently contacted Edwards and informed her of the concerns voiced by Hoback. Immediately thereafter, Edwards requested a meeting with Hoback to discuss a complaint that she had against Van Ness. During the meeting, Edwards claimed that she was being harassed by Van Ness and that Van Ness had unlawfully gained possession of her phone records.

The allegations asserted by Edwards prompted Hoback to investigate further. As part of his investigation, Hoback interviewed Van Ness on June 10, 2010. During the interview, at which another employee, Tiffany Bradbury, was also present, Van Ness provided information regarding her relationship with Croft, as well as Croft's relationship with Edwards. Toward the

3

end of the interview, Hoback was called out of the room to address another matter. While he was gone, Van Ness told Bradbury that she and Croft had engaged in sexual intercourse at Fire Station No. 4 on the night of April 15, 2010, while Croft was on duty. Bradbury subsequently relayed this information to Hoback.

On June 11, 2010, at Hoback's request, Van Ness provided a written statement regarding the events that occurred on the night of April 15, 2010. In the written submission, Van Ness stated as follows:

> On April 15, 2010 I met Dennis Croft at Station 9 after they got cleared off of a call (they were staging at Station 9 while Station 9 was at a fire – Engine 9 cleared at 10:21 – Engine 4 got cleared to go back to their station and I was invited to go back to Station 4 because everyone was up. This was at approximately 11pm. Dennis & I sat out in the bay while others were getting ready for bed. He then said come on and follow me and I went to his bunk room. One thing led to another and we had sex. I fell asleep after that because I was sick that day. We woke up around 1am (12:48 medic 4 got a call) and I waited until they got out of the building and I left. There have been times in the past that he tried to initiate sex, but I wouldn't do it at the station.

(Mot. for Summ. J., Ex. 10.) Van Ness also told Hoback that she and Croft had stopped dating, and that she believed that she was being harassed by Croft and Edwards. Van Ness acknowledged that she and Edwards had exchanged heated text messages regarding Croft.

Hoback proceeded to interview a number of other employees, including Tim Harris and Robert Joyner. Harris told Hoback that he had seen Croft kissing Van Ness in the service bay of Station No. 4 while Croft was on duty and in uniform. Additionally, both Harris and Joyner indicated that Van Ness's vehicle was in the parking lot when they left the station on an emergency call at 12:50 a.m. on April 16, 2010, and that the door to the Captain's bunk room was closed.

4

On June 15, 2010, Van Ness emailed Hoback a description of the Captain's bunk room at Fire Station No. 4. The email included a description of the bed in which Croft slept.

In addition to obtaining Van Ness's version of the events, Hoback requested information from Croft. Croft ultimately agreed to answer two questions in writing. In an email dated June 15, 2010, Croft indicated that he had not "had an inappropriate relationship (sexual) with any employee or non-employee of the department while on duty within the past 5 years of [his] employment." (Mot. for Summ. J., Ex. 14.) Croft also indicated that nothing inappropriate had occurred on the night of April 15, 2010 and that Van Ness was never allowed in the Captain's bunk room. Id.

Upon completing his investigation, Hoback consulted with Deputy Chief Ralph Tartaglia. Tartaglia agreed with Hoback that the results of the investigation supported a finding that Van Ness and Croft had engaged in sexual intercourse at Fire Station No. 4 on the night of April 15, 2010, while Croft was on duty.

Prior to deciding what disciplinary actions to take, Hoback met with the Director of Human Resources for the City of Roanoke, the Assistant City Manager, and the Assistant City Attorney. According to Carolyn Glover, the Director of Human Resources, "[t]he consensus of the group found that Ms. Van Ness's version of the events was credible," and that the results of the investigation indicated that Van Ness and Croft had engaged in sexual intercourse at the station on the night of April 15, 2010, while Croft was on duty as the station commander. (Mot. for Summ. J., Ex. 16.)

The findings of the investigation resulted in disciplinary actions being taken against Van Ness and Croft, although Croft's discipline was more severe. Van Ness, who was off duty at the

time of the alleged incident, was given a verbal reprimand. In a written memorandum to Van

Ness's personnel file, dated June 28, 2010, Hoback stated as follows:

> This memo serves as documentation of a verbal reprimand issued to
> Debbie Van Ness related to her off duty conduct on April 15, 2010 at Fire-
> EMS Station 4 involving Captain Croft. Van Ness was verbally council
> [sic] on this issue and instructed not to be on Fire-EMS property unless on
> duty.

(Br. in Opp'n, Ex. J.)

In contrast, Hoback determined that the circumstances warranted the termination

of Croft's employment. On June 17, 2010, Hoback issued Croft a Notice of Proposed Dismissal,

which provided as follows:

> This is to advise you that I intend to dismiss you from your employment as
> a Captain with the City of Roanoke Fire-EMS Department. The reasons
> for this proposed action are as follows:
>
> 1.  Violation of City P.O.P. 9 – It is the policy of the City of Roanoke
>     to discourage behavior which is unethical, illegal, in violation of
>     recognized standards of public decency and morality, or reflects
>     adversely on the City service.
>
>     April 15, 2010 Shift – You engaged in sexual activity with a
>     subordinate while on duty and while on city property (Fire – EMS
>     Station 4).
>
> 2.  Violation of City P.O.P. 9. VI. 6 – Failing to perform tasks
>     required by the job.
>
>     The rank of Captain makes decisions at the highest level of
>     accountability and appropriateness and is responsible for
>     enforcement of all department and City policies. You [sic]
>     actions on April 15, 2010 demonstrated your inability to exercise
>     the appropriate judgment in performing the essential functions
>     required of a Captain with the City of Roanoke Fire – EMS
>     Department.

6

(Br. in Opp'n, Ex. I.) Six days later, Hoback issued Croft a Notice of Dismissal, which advised Croft that his employment would be terminated effective June 25, 2010, and that he had the right to file a grievance pursuant to City Personnel Operating Procedure No. 6.

Croft subsequently filed a grievance contesting his proposed termination. After Hoback upheld his initial decision, the grievance was heard by Assistant City Manager James Grigsby. Grigsby reviewed the results of the investigation conducted by Hoback, and personally met with Van Ness and Croft to hear their versions of the events that transpired on the night in question. Grigsby ultimately found Van Ness's version of the events to be credible. Accordingly, he upheld Hoback's recommendation that Croft be terminated.

Croft then proceeded to the final step of the grievance process, which involved a hearing before the Personnel Employment Practices Commission ("PEPC") Panel. A final grievance hearing was conducted on May 23, 2011. After Croft and the City presented evidence and argument, the PEPC Panel voted 2 to 1 to reinstate Croft, but demote him to the rank of First Lieutenant and order him to participate in sexual harassment training. The Panel also awarded Croft back pay at the reduced rank of First Lieutenant. The Panel's decision was the final disciplinary decision for the events that occurred on the night of April 15, 2010.

Croft filed the instant action against the City on June 13, 2011. The case is presently before the court on the City's motion for summary judgment. The court held a hearing on the motion on March 6, 2012. The motion is ripe for review.

7

## Standard of Review

An award of summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To forestall summary judgment, the non-moving party must do more than present a "scintilla" of evidence in his favor. Anderson, 477 U.S. at 252. Instead, he must present sufficient evidence "such that a reasonable jury could return a verdict for the non-moving party." Id. at 248. In determining whether to grant a motion for summary judgment, the court must view the record in the light most favorable to the non-movant. Terry's Floor Fashions, Inc. v. Burlington Indus., Inc., 763 F.2d 604, 610 (4th Cir. 1985).

## Discussion

Title VII makes it unlawful for an employer to discriminate against an employee on the basis of gender. See 42 U.S.C. § 2000e-2(a)(1). Under well-settled case law, an employee may defeat a motion for summary judgment and establish a successful Title VII claim through two alternative methods of proof: the mixed-motive framework, in which "it is sufficient for the employee to demonstrate that the employer was motivated to take the adverse employment action by both permissible and forbidden reasons"; or the McDonnell Douglas[2] pretext framework, "under which the employee, after establishing a prima facie case of discrimination, demonstrates that the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination." Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284-85 (4th Cir. 2004). "Regardless of . . . whether [a plaintiff] proceeds under a mixed-

---

[2] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

8

motive or single-motive theory, '[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination.'" Id. at 286 (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 153 (2000)).

## I.    Mixed-Motive Framework

Although Croft addresses both methods of proof in his response to the City's motion for summary judgment, he maintains that "this is a mixed motive case." (Br. in Opp'n at 13.) Accordingly, the court will first evaluate Croft's claim of gender discrimination under this framework.

To survive summary judgment under the mixed-motive method of proof, an employee must present sufficient direct or circumstantial evidence for a reasonable jury to find that a protected trait "actually motivated" his employer's decision to take an adverse employment action. Reeves, 530 U.S. at 141. While the employee need not demonstrate that the protected trait was the sole motivating factor, he must show that it "actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome." Id. Thus, under the mixed-motive analysis, the question distills to whether Croft has marshaled sufficient evidence for a reasonable jury to find that the City's disciplinary action against him was "at least in part motivated by [gender] bias." Murray v. United Food & Commercial Workers Union, 100 F. App'x 165, 176 (4th Cir. 2004). For the following reasons, the court concludes that he has not.

Turning first to the "direct evidence" cited in his brief in opposition to summary judgment, Croft asserts that certain statements made by Chief Hoback, in the course of testifying about his internal investigation, provide direct evidence that the disciplinary action taken against Croft was improperly motivated by gender. The United States Court of Appeals for the Fourth

9

Circuit has defined "direct evidence" of discrimination as "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." Taylor v. Va. Union Univ., 193 F.3d 219, 232 (4th Cir. 1999). For instance, such "unaided proof" may consist of evidence that the employer "announced, or admitted, or otherwise unmistakably indicated that [a protected trait] was a determining factor" in a challenged employment decision. Cline v. Roadway Express, Inc., 689 F.2d 481, 485 (4th Cir. 1982) (citing Spagnuolo v. Whirlpool Corp., 641 F.2d 1109, 1113 (4th Cir. 1981)).

In this case, Croft first points to Hoback's testimony regarding the circumstances in which Van Ness admitted to allegedly engaging in sexual intercourse on the night in question. As previously summarized, Hoback interviewed Van Ness on June 10, 2010, with Tiffany Bradbury present. Van Ness did not admit to having engaged in sexual intercourse until Hoback left the room to attend to another matter. During Croft's grievance hearing, Hoback noted that Van Ness was evidently "more comfortable" sharing such intimate information with "another female" employee. (Br. in Opp'n, Ex. A at 274).

While Croft contends that Hoback's statement in this regard is direct evidence of a discriminatory animus, the court is unable to agree. A statement that simply references gender or some other protected trait, but fails to express any bias against an employee because of that trait, is insufficient to constitute direct evidence of discrimination. See Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring) (emphasizing that "[r]ace and gender always 'play a role' in an employment decision in the benign sense that these are human characteristics of which decisionmakers are aware and about which they may comment in a perfectly neutral or nondiscriminatory fashion"). Here, Hoback made the neutral observation that Van Ness was apparently more comfortable discussing an intimate matter with another female

10

employee, rather than the Chief himself. This benign reference to gender does not create any

inference that gender bias "actually motivated" the disciplinary action taken against Croft.

Reeves, 530 U.S. at 141; see also Brinkley v. Harbour Recreation Club, 180 F.3d 598, 608 (4th

Cir. 1999) ("To survive summary judgment on the basis of direct and indirect evidence, [the

plaintiff] must produce evidence that clearly indicates a discriminatory attitude at the workplace

and must illustrate a nexus between that negative attitude and the employment action.").

The court is similarly unpersuaded by Croft's reliance on the fact that Hoback also

considered Croft's relationship with another subordinate employee, Kathryn Edwards, in

assessing the incident involving Van Ness. During the grievance hearing, Hoback noted that

while Croft had always denied having an inappropriate relationship with Edwards, "a married

firefighter with two kids," Hoback was aware of a phone call from Edwards' husband, in which

her husband "confirmed that there was a relationship going on between [Croft] and Kathryn

. . . ." (Br. in Opp'n, Ex. A at 241.) Croft's relationship with Edwards was also discussed during

Hoback's deposition. When questioned about the relevance of this relationship, Hoback testified

as follows:

> Captain Croft made some very poor decisions in establishing relationships
> with two employees in our organization, the first one being Catherine [sic]
> Edwards, who is a married woman, with two children. And while I don't
> have any factual evidence to confirm that there was anything other than a
> strong bond of friendship between them, it was obviously creating some
> problems within the workplace. And Captain Croft had made several
> attempts to be assigned to a station that she was at, and step outside the
> realm of his responsibility as captain. And we needed to look into, you
> know, what was going on.
>
> And his decisions to foster a relationship with a married woman and then
> another employee, female employee within the organization was extremely
> poor judgment, extremely poor judgment, and it came to a head on June
> 10th.

11

(Br. in Opp'n, Ex. B at 49-50.)

It is clear from Hoback's testimony that he had concerns about the propriety of Croft's relationship with Edwards. However, given Croft's rank within the Fire Department and his responsibilities as Captain, the fact that Hoback also considered Croft's relationship with another subordinate employee in evaluating Croft's credibility does not directly reflect a "discriminatory attitude," Taylor, 193 F.3d at 232, or otherwise constitute direct evidence of intentional gender discrimination. Likewise, neither Hoback's reference to Edwards as a "married firefighter with two kids," or his description of Van Ness as a "divorced, single mom," Id., could support a rational fact finder's inference that the City's discipline of Croft was motivated by gender bias. See Price Waterhouse, 490 U.S. at 277 ("[A] mere reference to 'a lady candidate' might show that gender 'played a role' in the decision, but by no means could support a rational factfinder's inference that the decision was made 'because of' sex.").

In terms of circumstantial evidence, Croft claims that Hoback's investigation was "intentionally incomplete," since he did not interview Edwards or review all of the text messages sent between her and Van Ness. (Br. in Opp'n at 18.) Croft also emphasizes that his notice of termination specifically accused him of engaging in sexual activity in violation of certain policy provisions, whereas the internal memorandum documenting Van Ness's verbal reprimand did not mention any policy provisions or describe the underlying conduct. The court agrees with the City, however, that such evidence fails to create a triable issue of fact under the mixed-motive framework. While Croft may have legitimate arguments as to the adequacy of the internal investigation or the fairness of the outcome, the evidence proffered by Croft is insufficient to establish that gender, or any other protected trait, actually played a role in the City's

12

decisionmaking process and had a determinative influence on the outcome. Reeves 530 U.S. at 141. Accordingly, to the extent Croft's claim of gender discrimination is pursued under the mixed-motive framework, the court concludes that the City is entitled to summary judgment.

## II.     Pretext Framework

Croft alternatively maintains that he has proffered sufficient evidence to create a triable issue of fact under the second proof scheme available to him, the McDonnell Douglas pretext framework. Under this scheme of proof, the employee bears the initial burden of establishing a prima facie case of discrimination by a preponderance of the evidence. Hill, 354 F.3d at 285. If the employee satisfies his initial burden, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." Id. Once the employer has articulated a legitimate, nondiscriminatory explanation for its decision, "the burden shifts back to the [employee] to prove by a preponderance of the evidence that the employer's stated reasons 'were not its true reasons, but were a pretext for discrimination.'" Id. (quoting Reeves, 530 U.S. at 143).

To establish a prima facie case of discriminatory discipline, Croft is required to show: (1) that he is a member of a protected class under Title VII; (2) that the prohibited conduct in which he engaged was comparable in seriousness to the misconduct of an employee outside the protected class, and (3) that the disciplinary measures enforced against him were more severe than those enforced against the other employee. Cook v. CSX Transp. Corp., 988 F.2d 507, 511 (4th Cir. 1993). "In satisfying the requirements of elements two and three, [the plaintiff] must show that the other employee[] outside the protected class [was] 'similarly situated' in all respects." Monk v. Potter, 723 F. Supp. 2d 860, 877 (E.D. Va. 2010) (quoting Lightner v. City

13

of Wilmington, 545 F.3d 260, 265 (4th Cir. 2008)); see also Heyward v. Monroe, Case No. 97-2430, 1998 U.S. App. LEXIS 30855, at *6 (4th Cir. 1998) ("Heyward has not shown that either the two male employees or the two white female employees were similarly situated. She must show that they are similar in all relevant respects. There is no evidence that the employees dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.") (internal citation and quotation marks omitted).

In this case, Croft seeks to establish a prima facie case of gender discrimination by pointing to the fact that Van Ness, the female employee with whom he allegedly engaged in sexual intercourse, was disciplined less harshly. As the City emphasizes, however, the comparison between Croft and Van Ness is not sufficient because the two firefighters "are not comparable." Lightner, 545 F.3d at 265. The alleged incident occurred at Fire Station No. 4, where Croft was on duty as Captain. In that position, Croft was the commanding officer, responsible for enforcing Fire Department policies and rules, and "therefore was naturally expected to set an example by following the rules himself." Id. In contrast, Van Ness was not assigned to Station No. 4 and was off duty at the time of the incident, having already completed her shift as a part-time EMT. The court agrees with the City that the differences in their positions make the purported comparison in this case far "too loose" to establish a prima facie case of discrimination. See Id. (holding that two officers were not comparable, where the plaintiff was the Acting Division Commander of the Professional Standards Division of the Wilmington, North Carolina Police Department, and "the female officer was not a member of the

14

Professional Standards Division or even an Acting Division Commander at the time of her offenses").

Even if Croft could establish a prima facie case of discrimination, the City has articulated a legitimate, nondiscriminatory reason for the disciplinary action taken against Croft, namely that it was determined that Croft had sex with a subordinate employee at Fire Station No. 4, while he was on duty as the commanding officer of the station. Because the City has clearly met its burden of proffering a permissible reason for its disciplinary action, Croft must show that the asserted reason is pretext for discrimination. Hill, 354 F.3d at 285. While Croft advances several arguments in an attempt to establish pretext, the court concludes that he has failed to create a genuine issue of material fact.

Croft first argues that "the City's claim that the discipline was justified is only logically possible if one assumes the misconduct occurred," and that the City has no physical evidence to prove that he and Van Ness actually engaged in sexual intercourse on the night in question. (Br. in Opp'n at 22.) This argument, however, misconstrues Croft's burden. A factual dispute as to whether sexual intercourse actually occurred does not amount to a factual dispute as to whether City officials based their disciplinary decision, at least in part, upon the belief that Croft had engaged in sexual intercourse with a subordinate employee while he was on duty.

As the Fourth Circuit has explained on a number of occasions, "'[i]t is the perception of the decisionmaker which is relevant,'" when considering whether the employer's legitimate nondiscriminatory reason for acting adversely against the plaintiff is credible. Holland v. Wash. Homes, Inc., 487 F.3d 208, 217 (4th Cir. 2007) (quoting Tinsley v. First Union Nat'l Bank, 155 F.3d 435, 444 (4th Cir. 1998)). In Holland, the employer's proffered reason for terminating the

15

plaintiff was its president's belief that the plaintiff had threatened his supervisor. Id. at 214.

Finding that the plaintiff did not provide sufficient evidence addressing whether the employer's

president honestly believed the plaintiff was making threats, the Court held that the plaintiff was

unable to establish that the employer's reason for terminating him was pretextual. Id. at 215.

The Court noted that, even assuming the plaintiff did not actually threaten his supervisor, he still

had to demonstrate that the employer did not honestly believe he had done so in order to prove

that the employer's true motive was discriminatory. Id. at 217-218; see also DeJarnette v.

Corning, Inc., 133 F.3d 293, 299 (4th Cir. 1998) ("Our sole concern is whether the reason for

which the defendant discharged the plaintiff was discriminatory. Thus, when an employer

articulates a reason for discharging the plaintiff not forbidden by law, it is not our province to

decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the

reason for the plaintiff's termination.") (internal citation omitted).

In the instant case, Croft has failed to proffer evidence from which a reasonable jury

could find that City officials did not honestly believe that Croft and Van Ness had engaged in

sexual intercourse on the night in question. While Croft summarily argues that "the City did not

have any evidence that the misconduct occurred" (Br. in Opp'n at 24), this argument is belied by

the record. Chief Hoback investigated the matter, interviewed a number of employees, obtained

Croft's side of the story, and ultimately decided that Van Ness's version of the events was more

credible. Hoback shared the results of his investigation with the Deputy Chief, the Director of

Human Resources, and the Assistant City Manager, who also found that Van Ness's version of

the events was credible and that the results of the internal investigation indicated that Van Ness

and Croft had sexual intercourse while Croft was on duty. Likewise, upon speaking with Croft

and Van Ness during the grievance process, the Assistant City Manager remained convinced that Van Ness's version of the events was credible. On these facts, neither Croft's denial of any wrongdoing or his emphasis on the absence of a videotape or some other form of physical evidence, is sufficient to raise a triable issue of fact as to the truth of the City's stated reason for its disciplinary decision.

Croft's remaining arguments are also insufficient to demonstrate that gender discrimination was the real reason behind the disciplinary action taken against Croft. Once again, Croft argues that Hoback's internal investigation of the incident in question was inadequate. However, focusing on the quality of the investigation "misses the point." Cupples v. AmSan, LLC, 282 F. App'x 205, 210 (4th Cir. 2008). As the Fourth Circuit emphasized in Cupples, "[a] federal court 'does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination.'" Id. (quoting DeJarnette, 133 F.3d at 299). Instead, the court's "sole concern is whether the reason for which the defendant [took an adverse action against] the plaintiff was discriminatory." DeJarnette, 133 F.3d at 299.

Finally, the court agrees with the City that the fact that Hoback included more detailed information in Croft's formal disciplinary notices than he did in the internal memorandum documenting Van Ness's verbal reprimand is not evidence of pretext, nor is the fact that Croft was disciplined more severely. "While one method of proving disparate treatment is by showing dissimilar treatment, the persons being compared must be 'similar in all relevant respects.'" Odom v Int'l Paper Co., 652 F. Supp. 2d 671, 688 (E.D. Va. 2009) (quoting Heyward, 1998 U.S. App. LEXIS 30855, at *6). As discussed above, the court is convinced that this requirement

17

Case 7:11-cv-00277-GEC-RSB   Document 50   Filed 03/22/12   Page 17 of 18   Pageid#: 572

cannot be met in the instant case, given the differences in the positions held by Croft and Van Ness, and the fact that Croft was on duty at the time of the alleged misconduct. Accordingly, the court concludes that Croft has failed to proffer sufficient evidence of pretext to avoid summary judgment under the McDonnell Douglas framework.

## Conclusion

For the reasons stated, the court concludes that Croft has not presented evidence from which a reasonable jury could find that the City's disciplinary action against Croft was actually motivated, in whole or in part, by Croft's gender. Consequently, the City's decision, even if unwise or unfair, is not actionable under Title VII and the City is entitled to summary judgment.

The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to all counsel of record.

ENTER: This 22⁴ day of March, 2012.

_____
Chief United States District Judge

18